

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

## No. 02-19-00023-CV

———————————————————

### IN THE INTEREST OF A.M AND H.M., CHILDREN

---

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CV17-00557

---

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Mother and Father each appeal the trial court's February 4, 2019 order terminating their parental relationships with their daughters A.M. and H.M.[1] We affirm the trial court's order.

### II. BACKGROUND

Mother and Father are the biological parents of A.M. and H.M. At the time of trial in January 2019, A.M was almost four years old, and H.M. was eighteen months old.

### A. Report/Investigation

Father was incarcerated at the time of H.M.'s birth in August 2017. In mid-August 2017, the Texas Department of Family and Protective Services ("the Department") received a referral regarding Mother who, one month earlier, had tested positive for benzodiazepines, opiates, and codeine during a prenatal doctor's appointment.

Investigator Kathleen Matthies conducted a post-referral interview with Mother on August 18, 2017. At the time of Matthies's visit, A.M. was approximately two years and five months old and H.M. was a few days old. Mother told Matthies

---

[1]To protect the parties' privacy in this case, we identify the children by their initials and their parents simply as Father and Mother. *See* Tex. Fam. Code Ann. § 109.0029(d).

2

that she was a recovering methamphetamine addict and that Father was incarcerated in Oklahoma. Mother admitted that she had used methamphetamine in the past and had been using marijuana since she was sixteen years old. She denied using methamphetamine during her pregnancy with H.M. and claimed that she had not used methamphetamine for almost one year, but admitted that she had used hydrocodone throughout her pregnancy. After observing Mother interact with her children and having determined that H.M. and Mother did not test positive for any illegal or nonprescribed controlled substances, and finding that the home was clean and adequate, Matthies determined that no further action was required.

Approximately one month later, Mother called Matthies. Mother seemed confused and informed Matthies that she felt disturbed, might need to be "admitted," and had asked her father to watch the children for a week but he was unavailable. Mother had called Matthies to inform her that she was moving because her "mother-in-law" was moving "dopeheads" into Mother's home.[2] Although Matthies was Mother's caseworker, Mother also stated to Matthies that she believed "her caseworker"—a person other than Matthies—was following her. There was only one investigative unit in Cooke County, and Matthies would have known—but was unaware—of any reason for another caseworker to be involved in Mother's case. When Matthies met Mother at her father's house, Mother admitted she had taken a

---

[2]Mother and Father were not married, but Mother referred to Father's mother as "mother-in-law."

nonprescribed Xanax. After Matthies administered a drug test to Mother and informed her of the results,[3] Mother confessed that she had used methamphetamine less than a week before.

**B.    Removal of Children and Petition for Protection and Conservatorship of Children and Termination of Parent–Child Relationships**

Matthies consulted her supervisor. Because Father was still incarcerated and because it was not possible to appropriately place the children without removal, the Department removed the children from Mother's home.

On September 19, 2017, the Department filed a petition for protection of the children, conservatorship, and termination of Mother's and Father's parental rights. The trial court signed an emergency order removing the children from Mother's home and appointed the Department temporary sole managing conservator of the children. After their removal, one of Matthies's coworkers bathed the children. A.M. had matted hair, "a whole lot of bug bites and scratches and stuff all over her body . . . legs, arms, back and feet," a tick behind her left ear, a black sticky substance on her neck, and scabs on her scalp. The disposable diaper that H.M. was wearing was "so full of crystals that it was stuck to her bottom," and the bath water was "extremely filthy."

---

[3]By agreement, the results of the test were not admitted in evidence.

## C. Parental Service Plans

Spencer Brown was the Department's conservatorship worker tasked with preparing and explaining the service plans to Mother and Father, monitoring the children's access to services, and making a recommendation regarding the children. Brown prepared family service plans for each parent, which required that Mother and Father complete participation in certain services and perform specified tasks as set forth in their respective plans. On November 9, 2017, the trial court made the service plans an order of the court and noted that the plans established the actions necessary for each parent to obtain the return of the children as set forth in section 161.001(b)(1)(O) of the Texas Family Code. *See* Tex. Family Code Ann. § 161.001(b)(1)(O).

### 1. Mother

Mother's service plan required that she (1) attend a substance abuse support group; (2) maintain contact with and keep the caseworker informed of service progress, case details, and pertinent changes; (3) obtain and maintain a suitable living arrangement for six consecutive months; (4) provide child support; (5) submit to random drug testing; (6) successfully complete a parenting class; (7) attend and participate in weekly individual counseling sessions; (8) complete a drug and alcohol assessment; (9) attend all scheduled case appointments; (10) avoid criminal activity, including the use of illegal substances; (11) obtain and demonstrate a legal and

5

verifiable income for six consecutive months; and (12) complete a mental health evaluation and follow all recommendations.

### 2. Father

Father's October 11, 2017 service plan required him to (1) contact the caseworker after his release from incarceration; (2) participate in any proactive services available to him such as counseling and classes and complete caseworker-issued parenting packets and assignments; and (3) maintain monthly contact with the caseworker. The plan also encouraged Father to "write to his children (draw pictures, etc[.])."

## D. Trial Proceedings

In its petition, the Department sought termination of Mother's parental relationships with the children based on the predicate termination grounds set forth in subsections D, E, F, O, and P of section 161.001(b)(1) of the Texas Family Code.[4] Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (F), (O), (P). The petition sought termination of Father's parental relationship with the children based on the predicate termination grounds set out in subsections D, E, N, O, and Q.[5]    *Id.* § 161.001(b)(1)(D), (E), (N), (O), (Q).

---

[4]The Department abandoned the predicate termination grounds it had alleged under subsections K and N as to Mother. Tex. Fam. Code Ann. § 161.001(b)(1)(K), (N).

[5]The Department obtained the trial court's permission to amend its petition to allege constructive abandonment against Father under subsection N, which it had

### 1.    Mother

Trial was to a jury.  During her testimony, Mother acknowledged that she had failed to comply with the requirements of her court-ordered service plan by failing to refrain from criminal activity, to complete her drug treatment program, to secure safe and stable housing for six months, to secure and maintain a stable income, and to pay child support.  Mother admitted that she had relapsed and had continued using methamphetamine.

Brown confirmed that Mother had made a reasonable effort in the months before trial to satisfy her service plan but noted that before those recent efforts, Mother had been using drugs and breaking the law and, although her counseling was ongoing, Mother had failed to be successfully discharged by a counselor.  He also noted that Mother had failed to follow through with drug and alcohol assessment recommendations, to avoid criminal conduct, and to secure and maintain stable income and housing.  When asked whether he had seen twenty-three certificates that Mother may have received from intensive outpatient counseling, Brown answered that he had not seen any and agreed that Mother did not benefit from any intensive outpatient counseling she did complete.

Bryce Kennedy, an officer of the Cooke County Sheriff's Office narcotics unit, arrested Mother on July 24, 2018.  Acting as the middleman between a buyer and

inadvertently omitted from the petition, and it abandoned the predicate termination grounds that it had alleged under subsections F, K, and P.  Tex. Fam. Code Ann. § 161.001(b)(1)(F), (K), (N), (P).

seller of methamphetamine, Mother had advised the buyer regarding what was available for purchase and then drove the seller, a recently-paroled prison gang member, to meet the buyer. Kennedy testified that Mother's name had appeared in multiple cell phones as a buyer, seller, or negotiator of drug sales and that she had been arrested on prior drug charges. After her July 24, 2018 arrest, Mother admitted to using methamphetamine that day. At the time of that arrest, Mother appeared to be under the influence of methamphetamine and possibly a depressant of some kind because she had slow or delayed reactions. Kennedy knew that Mother was involved with a "narcotics gang," but he acknowledged that he had no information that Mother or Father was a member of any other kind of gang. Mother was charged with engaging in organized criminal activity manufacturing or delivering a controlled substance in penalty group 1, a first-degree felony offense with a punishment range of confinement between five and ninety-nine years or life.

### 2. Father

At trial, Father admitted that he did not write to Brown every month but asserted that he had done his best to communicate with him. Father claimed that he took advantage of all services available to him in prison and would disagree if someone said that he did not. According to Father, Brown had visited him on a single occasion about five weeks before trial and had informed him that Mother's rights would likely be terminated, but Brown had also told him that the Department

8

would attempt to permit Father to seek some kind of rights with his children. Father believed that his incarceration was not a basis for terminating his parental relationship.

Brown testified that his ability to work with Father was limited because of Father's incarceration in Oklahoma and restrictions on Brown's ability to perform work in another state. Brown agreed that he first met with Father approximately five weeks before trial for fifteen minutes and discussed the legal proceedings, told Father about his children, and asked Father what he had done while incarcerated. Brown denied that he had informed Father that the Department would not be seeking to terminate his parental rights, which had been the Department's goal since February 2018. Brown did not know whether the Department had ever sought to reunify the children with Father, and he explained that Father was provided a service plan because he had a right to attempt to do his best and sometimes circumstances change. Brown could not recall whether Father had expressed to him a desire to retain his relationship with the children.

Before they met, Brown had provided Father a minimal service plan which required that he maintain monthly contact with Brown at the address listed on the plan and seek and provide verification of his participation in any service or rehabilitative function offered to him while incarcerated. Father did not successfully complete all of his services. Father failed to stay in contact with Brown as required, had written to him only seven times during the fifteen- or sixteen-month period, and had sent a single letter addressed to one or both children. Father did not send to

Brown any birthday, Christmas, or Easter cards addressed to his children. Although Brown attempted to confirm with prison personnel whether Father had completed all services available to him during his incarceration, Brown was not successful. Brown acknowledged that Father eventually provided to him certificates regarding Father's participation in some activities while incarcerated.

### 3. Findings

After considering this and other evidence, the jury determined that the parent–child relationships between Mother, Father, and the children should be terminated. The jury found that the Department had proven by clear and convincing evidence that Mother had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, pursuant to subsection D; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being, pursuant to subsection E; (3) failed to support the children in accordance with her ability during a period of one year ending within six months of the date of the filing of the petition, pursuant to subsection F; (4) failed to comply with the provisions of a court order that specifically established the actions necessary for Mother to obtain the return of the children who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from Mother under Chapter 262 for the abuse or neglect of the children, pursuant to subsection O; and (5) used a controlled

substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the children, and (a) failed to complete a court-ordered substance abuse treatment program or (b) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance, pursuant to subsection P. *Id.* § 161.001(b)(1)(D), (E), (F), (O), (P).

The jury found that the Department had proven by clear and convincing evidence that Father had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, pursuant to subsection D; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being, pursuant to subsection E; (3) constructively abandoned the children who had been in the permanent or temporary managing conservatorship of the Department for not less than six months when (a) the Department had made reasonable efforts to return the children to Father, (b) Father had not regularly visited or maintained significant contact with the children, and (c) Father had demonstrated an inability to provide the children with a safe environment, pursuant to subsection N; (4) failed to comply with the provisions of a court order that specifically established the actions necessary for Father to obtain the return of the children who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from Father under Chapter 262 for the abuse or neglect of the

11

children, pursuant to subsection O; and (5) knowingly engaged in criminal conduct that had resulted in Father's being convicted of an offense and confinement or imprisonment and inability to care for the children for not less than two years from the date when the petition was filed, pursuant to subsection Q. *Id.* § 161.001(b)(1)(D), (E), (N), (O), (Q).

The jury also found that termination of the parent–child relationships was in the children's best interest. Based on the jury's findings, the trial court thus terminated the parent–child relationships between Mother, Father, and the children and appointed the Department as the children's managing conservator.

### III. DISCUSSION

**A.    Mother's Appeal**

Mother's appointed appellate counsel has filed a motion to withdraw. In his *Anders* brief in support of the motion, Mother's appellate counsel asserts that he is unable to identify errors warranting reversal of the trial court's termination order and acknowledges that there is legally and factually sufficient evidence to support the five predicate grounds for termination identified in the trial court's order terminating Mother's relationship with the children, as well as the "best interest" determination. *See Anders v. California*, 386 U.S. 738, 744, 87 S. Ct. 1396, 1400, 18 L. Ed. 2d 493 (1967); *In re K.M.*, 98 S.W.3d 774, 777 (Tex. App.—Fort Worth 2003, no pet.) (holding that *Anders* procedures apply to termination of parental rights appeals when

12

court-appointed counsel has concluded that there are no nonfrivolous issues for appeal).

The brief satisfies *Anders's* requirements by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. *See Kelly v. State*, 436 S.W.3d 313, 318 (Tex. Crim. App. 2014) ("The purpose of the *Anders* brief is to satisfy the appellate court that the appointed counsel's motion to withdraw is, indeed, based upon a conscientious and thorough review of the law and facts . . . ."); *see also In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (order) (noting that counsel in termination appeal may satisfy obligation to client by "filing an appellate brief meeting the standards set in *Anders v. California*[] and its progeny" (footnote omitted)). Although advised by counsel of her right to obtain the appellate record and file a pro se response, Mother has not filed a pro se response to the *Anders* brief or counsel's motion to withdraw. The Department has declined to file a brief in response to the *Anders* brief of Mother.

After an appellant's court-appointed attorney files a motion to withdraw on the ground that the appeal is frivolous and fulfills the requirements of *Anders*, this court is obligated to undertake an independent examination of the record to determine if any arguable grounds for appeal exist. *See Stafford v. State*, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991); *Mays v. State*, 904 S.W.2d 920, 922–23 (Tex. App.—Fort Worth 1995, no pet.). When analyzing whether any grounds for appeal exist, we consider the record,

13

the *Anders* brief, and any pro se response. *In re Schulman*, 252 S.W.3d 403, 408–09 (Tex. Crim. App. 2008) (orig. proceeding).

We have reviewed the appellate record and find no arguable grounds for Mother's appeal. *See In re D.D.*, 279 S.W.3d 849, 850 (Tex. App.—Dallas 2009, pet. denied) (citing *Bledsoe v. State*, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005)). Having carefully reviewed counsel's brief and the appellate record, we find no reversible error and agree with counsel that this appeal is without merit. Therefore, we affirm the trial court's order terminating Mother's relationship with the children.

Because counsel's motion to withdraw does not show good cause for the withdrawal independent from counsel's conclusion that the appeal is frivolous, we deny the motion. *See P.M.*, 520 S.W.3d at 27–28; *In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pet. denied). Accordingly, counsel remains appointed in this appeal through proceedings in the supreme court unless otherwise relieved from his duties for good cause. *See* Tex. Fam. Code Ann. § 107.016(3)(C); *P.M.*, 520 S.W.3d at 27.

## B. Father's Appeal

### 1. Father's Sole Issue

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in family code section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *In re E.N.C.*,

14

384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

Father concedes that the evidence is legally and factually sufficient to support a finding by clear and convincing evidence that he failed to comply with the provisions of the court's order specifically establishing the actions necessary for him to obtain the return of his children under section 161.001(b)(1)(O),[6] and he does not challenge the evidence supporting the jury's findings under subsections D, E, N, or Q as independent grounds to reverse the judgment. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (Q). But he does challenge the sufficiency of the evidence to support the other four predicate findings in the context of his sole issue:

---

[6]The trial court's orders specified that Father was ordered to comply with each requirement set out in the Department's service plan. The service plan required that Father "participate in any proactive services available to him," "provide verification of participation/completion of these services via mail[] to the caseworker," "complete any parenting packets[] and similar assignments[] sent to him by the caseworker," "complete any releases of information," "maintain monthly contact with the caseworker[] by mail" at the address provided in the plan, and encouraged Father "to write his children (draw pictures, etc[.])" at the address provided. Reviewing the evidence under the applicable standards, we conclude the evidence is legally and factually sufficient to support the trial court's finding (1) that Father failed to comply with the provisions of a court order specifically establishing the actions necessary for him to obtain the return of his children and (2) that Father failed to prove by a preponderance of evidence that he was unable to comply with specific provisions of a court order and that he made a good-faith effort to comply with the order and that his failure to comply was not his fault. *See* Tex. Fam. Code §§ 161.001(b)(1)(O), 161.001(d).

that the evidence is legally and factually insufficient to support the jury's determination that termination of his parental rights is in the best interest of the children. In other words, Father contends that because the evidence is insufficient to support those grounds, we cannot consider them in our best-interest analysis and, therefore, the evidence is insufficient to prove that termination is in the children's best interest.

## 2. Standards of Review

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable fact finder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the fact finder settled any evidentiary conflicts in favor of its finding if a reasonable fact finder could have done so. *Id.* We disregard all evidence that a reasonable fact finder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable fact finder could, and we disregard contrary evidence unless a reasonable fact finder could not. *See id.* The fact finder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due

deference to the jury's findings and do not supplant its findings with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a fact finder could reasonably form a firm conviction or belief that the termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the fact finder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### 3. Applicable Law

Evidence probative of a child's best interest may be the same evidence that is probative of a subsection (1) ground. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28. In making our determination, we must employ a strong presumption that keeping a child with a parent serves the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We also consider the evidence in light of nonexclusive factors that the trier of fact may apply in determining the child's best interest:

(A)   the child's desires;

(B)   the child's emotional and physical needs, now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the child's best interest;

17

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### 4. Analysis

#### a. *Expanded Sufficiency Review Under Subsections D and E*

The Supreme Court of Texas has recently held that "[w]hen a parent has presented the issue on appeal, an appellate court that denies review of a section 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children." Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re N.G.*, No. 18-0508, 2019 WL 2147263, at *3 (Tex. May 17, 2019). After examining

18

the evidence addressed below, including but not limited to Father's long and persistent methamphetamine use, long criminal history, and repeated incarcerations, we conclude that the evidence is legally and factually sufficient to support the jury's endangerment findings under subsections D and E by clear and convincing evidence. *See, e.g., In re J.W.*, No. [0]2-08-[00]211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.).

When evaluating whether termination of his parental relationship is in the best interest of the children, Father asserts that we should disregard any argument that he endangered his children by knowingly placing or knowingly allowing them to remain in conditions or surroundings that endangered their physical or emotional well-being because ground D provides no basis for termination if a parent is unaware of the endangering environment. Tex. Fam. Code Ann. § 161.001(b)(1)(D). Father similarly argues that a reasonable fact finder could not have formed a firm belief or conviction that he engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children pursuant to subsection E because there is no evidence that he engaged in conduct endangering his children. *Id.* § 161.001(b)(1)(E). We disagree.

Both subsections D and E use the term "endanger." *Id.* § 161.001(b)(1)(D), (E). In this context, endanger means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 711–12 (Tex. App.—El Paso

19

2012, no pet.). "Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the child suffers actual injury. *Jordan v. Dossey*, 325 S.W.3d 700, 721–23 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). The endangerment must be the result of a voluntary, deliberate, and conscious course of conduct by the parent rather than a single act or omission. *Id.* at 723; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). To determine whether termination is necessary, courts look to parental conduct both before and after the child's birth. *In re J.T.G.*, 121 S.W.3d at 125.

Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the "conditions or surroundings" of the child's home under subsection D. *See Jordan*, 325 S.W.3d at 721. When termination of parental rights is based on subsection D, the endangerment analysis focuses on the evidence of the child's physical environment, but the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *Id.* at 722.

Father is correct that subsection D is not a basis for terminating parental rights if the parent was unaware of the endangering environment. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Endangerment can be exhibited by both actions and failures to act. *Id.* at 477 (citing *In re U.P.*, 105 S.W.3d

20

222, 233 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)). It is not necessary that the parent's conduct be directed towards the child or that the child actually suffer injury; rather, a child is endangered when the environment creates a potential for danger of which the parent is aware but disregards. *S.M.L.*, 171 S.W.3d at 477. A parent need not know for certain that the child is in an endangering environment: awareness of such a potential is sufficient. *Id.* (*citing In re Tidwell*, 35 S.W.3d 115, 119–20 (Tex. App.—Texarkana 2000, no pet.) (explaining that it is not necessary for a parent to have certain knowledge that a criminal offense actually occurred; it is sufficient that the parent was aware of the potential for danger to the children and disregarded that risk by leaving the children in that environment.)). "Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *J.T.G.*, 121 S.W.3d at 125. The relevant time frame under this subsection is prior to the child's removal. *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied).

Between 2007 and 2018, Father had been convicted in Texas for possession of methamphetamine, burglary of a motor vehicle, and five theft offenses. The sentences for these offenses ranged from community supervision to confinement in county jails, state jails, and prison for periods ranging from fifteen days to four years. Father had also been convicted in the state of Oklahoma for the offenses of

knowingly concealing stolen property and possession of a stolen vehicle, for which he was sentenced to concurrent four-year terms of confinement.

At the time of trial, Father was thirty four years old and was still serving a four-year sentence for theft of a motorcycle in Texas after having served his sentence in Oklahoma for knowingly concealing stolen property. Father expected to be paroled within the year but admitted that if he were not released on parole, his sentence would not end until 2021.

In this case, there is sufficient evidence showing that Father was aware of the potential for the environment to endanger his children. *See S.M.L.*, 171 S.W.3d at 477. Father's admissions that he had used methamphetamine with Mother and with visiting friends before his incarceration, his knowledge that smoking methamphetamine in the absence of a child posed a danger for children who might later contact its residue, and his own criminal activity are evidence demonstrating Father's awareness of an environment sufficient to show endangerment under subsection D. Tex. Fam. Code Ann. § 161.001(b)(1)(D); *S.M.L.*, 171 S.W.3d at 477–79 (noting that whether father neglected child or merely observed neglect, fact finder could have reasonably inferred that father had knowledge of endangering environment before departing for jail and holding that evidence that father went to jail and failed to act to prevent child from remaining alone in an unfit home environment with a mother who was unable to care for the child supported termination of father's relationship under subsection D); *J.T.G.*, 121 S.W.3d at 125.

22

Subsection E authorizes termination if the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(b)(1)(E). The relevant inquiry under this subsection is whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being. *See Jordan*, 325 S.W.3d at 723; *J.T.G.,* 121 S.W.3d at 125.

Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *Jordan*, 325 S.W.3d at 723; *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). The commission of criminal conduct by a parent may support termination under subsection E because it exposes the child to the possibility that the parent could be imprisoned. *See In re M.C.*, 482 S.W.3d 675, 685 (Tex. App.—Texarkana 2016, pet. denied); *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (stating that intentional criminal activity which exposes the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well-being of the child). While criminal violations and incarceration are not enough to show endangerment by themselves, they can be evidence of endangerment if shown to be part of a course of conduct that is endangering to the child. *In re R.A.G.*, 545 S.W.3d 645, 651–52 (Tex. App.—El Paso 2017, no pet.) (citing *Tex. Dep't of Human Servs v. Boyd*, 727 S.W.2d 531, 533–34 (Tex. 1987)). Likewise, a fact finder may

23

infer that a parent's lack of contact with the child and absence from the child's life endangered the child's emotional well-being. *See U.P.*, 105 S.W.3d at 236.

Here, the evidence showed that Father and Mother used methamphetamine before removal of the children from the home and that Father had been convicted of and was incarcerated for committing multiple criminal offenses. As a result, Appellant was incarcerated before H.M. was born and remained incarcerated at trial. Father had been absent for all of H.M.'s life and for a significant portion of A.M.'s life. While incarceration is not sufficient, standing alone, to support a finding under subsection E, these facts are part of Father's overall course of conduct and are sufficient to establish a firm conviction or belief in the mind of the fact finder that Father engaged in conduct that endangered the children's physical or emotional well-being under subsection E. *See R.A.G.*, 545 S.W.3d at 651–52. Therefore, we conclude the evidence is legally and factually sufficient to support the jury's subsections D and E findings and will not disregard the evidence supporting those findings when analyzing whether termination is in the children's best interest.

> b.      *Holley Factors*

> i.      *Present and future needs and danger*

We next address the *Holley* factors, which we discuss out of order for ease of discussion. *Holley*, 544 S.W.2d at 371–72. The second and third factors concern the children's emotional and physical needs now and in the future, and the emotional and physical danger to the children now and in the future, which we consider together. *Id.*

24

at 371–72. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied); *see also In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) ("Stability and permanence are paramount in the upbringing of a child.").

On appeal, Father admits that he is unable to provide for his children's needs and will require support to provide for their needs when he is released from incarceration. He acknowledges that to rebuild his relationship with his daughters he will need to demonstrate to a court that he is not using drugs or committing criminal offenses. He contends, however, that this admission does not support a finding that termination is in the best interest of his children.

When Father testified at trial, he was thirty four years old. He had begun using methamphetamine when he was sixteen years old and had last used the drug in 2017. Father admitted that he was using methamphetamine with Mother before he went to prison in Oklahoma.

Father initially explained his belief that it is possible to be a good parent while using methamphetamine if the children are not present but stated that he did not intend to use the drug after being released from prison. Father agreed that his past use of methamphetamine was a basis for concern and that it would be improper to place his children in his care unless he could establish that he was not using methamphetamine again and could support them. He explained that in the past, he

25

had used methamphetamine when friends would bring the drug during visits, and he claimed that A.M. was never exposed to the drug during those times because she was with his mother or Mother's parents and was never present during his use. Father acknowledged, however, that his sister and Mother's father, mother, brother, and niece have histories of methamphetamine use.

Father subsequently asserted that although he previously thought it was "no big deal" to use methamphetamine as long as the children were not present, after gaining sobriety, he knows that it is not good for the children and declared that "[It's] not going to happen ever again." Father acknowledged that before his incarceration, he had tried to quit using methamphetamine for a long time. He also quit using the drug a least once but had relapsed when a friend brought the drug to him during a visit.

Father agreed that it is not good for children to grow up in a home with parents who use drugs and are periodically in jail because this could expose the children to dangerous situations and because sometimes people who use methamphetamine can become violent. Father acknowledged that when methamphetamine is smoked, a residue is left that endangers children even if children are not present when the drug is being smoked. While Father initially stated that his past behavior had not shown danger to his children, he later agreed that being in and out of prison causes them trouble. Further, he agreed at trial that it would not be appropriate for the court or jury to place the children in his care at that time. Father acknowledged that he could not then provide a safe home for his children due to his

circumstances and that his past behavior and repeated confinement had endangered the emotional, mental, and physical well-being of his children. He acknowledged that he would not immediately recover custody of his children after his release from confinement and, to regain custody of them, he would need to demonstrate that he could support his children and was not using methamphetamine.

Father recalled that he met Mother when he accidentally shot himself with a small gun as he attempted to place it in his pocket. As a result, he lost a toe but explained that he no longer had the gun and did not have guns before he was arrested or while the children were at home. He noted that he and Mother had been together since that event and that Mother had "stuck by [his] side the whole time." Father was aware that A.M. had made sexual outcries against Mother, and although he did not think A.M. would "make it up," he believed "it's something that's been put in her head."

The foster mother testified that when H.M. was first delivered to the foster family, she was asleep in a car seat and very lethargic, her head stayed turned to the right, and she did not eat well or have many wet diapers for two days. H.M. did not make eye contact, had no startle reaction to sound or anything visual, and stared off into the distance. The foster parents would position H.M.'s head to require that she look to the left during feedings. The foster parents took H.M. to occupational and physical therapy. Over three to four months, H.M. wore a cranial helmet for twenty-three hours a day to reshape her head. At the time of trial, H.M. was crawling

27

unconventionally by dragging her left leg and using her right leg to scoot herself forward, was learning to stand, and was late in learning to walk.

When A.M. first arrived at the foster home, she was scared, dirty, and smelled, and she had scabies, sties around her eyes, a purplish color under her eyes, yellow-green drainage emerging from her nose, and a cough. A.M. had very aggressive temper tantrums, causing her foster family concern that she would hurt herself or someone else. A.M. became hysterical during bath time and would hit, kick, bite, scratch, and throw herself about. Eventually, she began acting inappropriately during bath time by "sticking her fingers into her private parts or toys up by her private parts." After placing a baby monitor in A.M.'s room, the foster parents observed that A.M. would also act out sexually at bedtime and naptime by sitting on dolls' faces and acting like she was having sex with the dolls, and "moving around sexually." If the dolls were removed, A.M. would put her hands in her pants or sit on her hand or another object, "move around sexually," and play with her breasts or other parts of her body.

At night, A.M. was hypervigilant. While keeping herself awake, she would barricade and sit by her door and bang on it or scream, or she would rock back and forth in the middle of the room and stare off into space for twenty minutes or longer. Other times, A.M. would hide between a dresser and a wall and say she was scared of monsters. A.M. would also poke herself in the eyes—with her eyes open—using blankets or sunglasses and showed no apparent pain sensation; when the foster family

would attempt to redirect her attention, A.M. would smile and say, "I like it." A.M. stated that she poked or covered her eyes because she did not want to see and that she was scared. The foster mother believed these acts may have been the source of A.M.'s eye sores.

A.M. would eat without a sense of when to stop, would sneak food, and would get up in the night to get food. The foster parents acted to reassure or correct A.M.'s behavior in accordance with her play and behavior therapists's guidance. The foster mother began recording A.M.'s behavior because she had not seen this behavior before. When the foster mother asked A.M. why she was acting as she did, A.M. would say, "Visit mommy showed me how to do this," or "[V]isit mommy do this." The foster mother clarified that the term "visit mommy" arose from A.M.'s reference to Mother or "Mommy from visit." Foster mother notified the Department about A.M.'s strange behaviors. Since being in foster care, A.M. had attended play, behavioral, and occupational therapy, and it was ongoing at the time of trial.

Brown noted that behavioral and play therapy is common for children that have been abused or neglected. Brown did not believe that Mother and Father could meet the children's physical, mental, and emotional needs.

A.M.'s behavioral therapist, Tiffany LeBlanc, explained that A.M. had demonstrated behaviors that are more extreme than those of a child who did not have the same experiences that A.M. had faced and had needed therapy for on-the-floor tantrums, defiance, very drastic mood changes, and verbal and physical aggression.

29

LeBlanc noted that A.M. was one of her first clients who had shown very low self-esteem "at such a young age." LeBlanc agreed that these behaviors were all "much worse in [A.M.] than you would expect in a normal 3-year-old." Because A.M. had shown regression after advancement, LeBlanc estimated at the time of trial that A.M. would need years of therapy.

LeBlanc acknowledged that a parent who uses methamphetamine or is constantly in and out of jail can have a negative effect on the emotional and mental health of a child. Recognizing that reunification between a parent and child is important, LeBlanc nevertheless observed that many times it should not occur because placing a child with a parent who has not adequately addressed his drug problem is not beneficial to a child's mental or emotional health.

A fact finder may infer from a parent's past inability to meet a child's physical and emotional needs an inability or unwillingness to meet a child's needs in the future. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *Id.* Although the children's physical and emotional conditions, and A.M.'s behaviors, appear to be directly the result of Mother's care, Father's incarceration left the children solely in Mother's care. Based on the evidence of the children's physical and emotional conditions at the time of removal and while in care, the fact finder could infer that Father's repeated drug use, arrests, and incarcerations would continue to be a danger to the children's

30

physical and emotional needs and well-being in the future. *Id.*; *see also R.A.G.*, 545 S.W.3d at 652, 653 (citation omitted) (stating that fact finder could infer that parent's lack of contact with child and absence from child's life endangered the child's emotional well-being when parent was arrested for drug-trafficking, was subsequently absent for the first four years of child's life due to incarceration, and had failed to engage with child after removal). The second and third factors weigh in favor of the trial court's best-interest finding.

### ii. Parenting abilities

The fourth factor is the parenting abilities of the individuals seeking custody of the children. In reviewing the parenting abilities of a parent, a fact finder can consider the parent's past neglect or past inability to meet the physical and emotional needs of the children. *J.D.*, 436 S.W.3d at 118.

At trial, Father agreed that he could not parent well while in jail and that a child whose parent repeatedly returns to jail does not have a stable life, which is not good for the child. Father also agreed that if he continued to return to jail, he could not properly parent his children.

Father acknowledged that he has three other children who were removed from his custody during the Department's case involving his ex-wife. Father explained that the removal occurred because he began using methamphetamine after he and his ex-wife fought and separated. Father claimed that his ex-wife reported his drug use to the Department. After he was "swabbed," Father informed the caseworkers that he

31

had used methamphetamine, and the children were removed from his custody. Father asserted that he had retained his rights to those children, who were in the custody of their grandmother, and could obtain custody of them after proving himself to the court after his release from prison.

Father acknowledged that if he were convicted of another felony criminal offense, his sentence could be enhanced so that he would be subject to confinement for life. He declared that this possibility scared him and was a reason why he would not offend again. The trial court admitted Father's certificates showing the courses he had completed during his incarceration, which included "Inside Out Dad," "Managing My Anger," "A Sense of Family," "Christians Against Substance Abuse," and "Manufacturing Principles."

Father testified that he did not believe that Mother's rights should be terminated and felt that she deserved to be with their children. Father also hoped to resume his relationship with Mother after his release from incarceration. When subsequently asked whether he believed A.M.'s sexual abuse outcries which implicated Mother, Father expressed his belief that someone had coached A.M.

A.M.'s therapist LeBlanc declared that A.M.'s behavioral issues for which she was receiving therapy were not the result of being removed and placed with the foster family, but rather were a display of A.M.'s feelings and emotions resulting from her life with her biological parents. LeBlanc indicated that she probably would not have needed to help teach certain skills to A.M. if she had learned them from her parents

before she was placed in foster care. LeBlanc also noted that children whose parents are constantly in and out of jail and constantly use narcotics, methamphetamine, marijuana, and other substances are very likely to learn that this is acceptable behavior and are more likely to become drug users and criminals as well.

Brown agreed with Father that methamphetamine is highly addictive and affects a person's mental functioning, thought patterns, memory, decision making, and character and poses a danger to children whose parents use it. Brown noted that a person cannot be a good parent while using methamphetamine. According to Brown, parents who use methamphetamine are unable to keep themselves or their children safe. Although the children could not protect themselves and make a choice to not be exposed to methamphetamine and drug dealers, Brown noted that Father and Mother could have made those choices. He agreed that because Father had allowed his children to stay in the home where he and Mother had used methamphetamine, Father was not capable of protecting his children. Brown agreed that A.M. was going to need ongoing counseling and also needed to be with someone who would take her sexual abuse history as seriously as the foster parents did.

Brown had no concerns about the children after they entered foster care. The foster parents had taken the children to all of their therapy, medical, and dental appointments and were clothing, feeding, and protecting the children. The children's physical, mental, emotional, and safety needs were being met, and A.M. had informed Brown that she felt safe in her foster home. The foster parents were seeking custody

of the children and were willing to adopt the children together if it was determined that termination of the parent–child relationship was in the children's best interest.

At the time of trial, the children had been in foster care for over a year. Although the foster mother had not been contacted by nor had she received information from Father, she voluntarily sent pictures of the children to him. Father did not request pictures of the children and never sent cards for the children.

While there is some evidence showing that father completed parenting-related courses while in prison, the other evidence, including father's trial testimony, supports a conclusion that Father has poor parenting skills. This factor weighs in favor of the best-interest finding.

### iii. Children's desires

The first *Holley* factor is the desire of the children. *Holley*, 544 S.W.2d at 371–72. Father observes that there is no evidence of the children's desires regarding termination of his relationship to them. We agree. However, evidence that a child is well-cared for by her foster family, is bonded to her foster family, and has spent minimal time in the presence of a parent is relevant to the best interest determination under the desires-of-the-child factor. *See R.A.G.*, 545 S.W.3d at 653; *U.P.*, 105 S.W.3d at 230.

At trial, testimony established that the children were bonded to the foster family and that the foster family was providing necessary care for the children. The foster family had taken H.M. to medical and therapy appointments and had ensured

34

that H.M. wore a prescribed cranial helmet. H.M. was also attached to the foster family's sons. The foster parents had taken A.M. to see her doctor, dentist, and play therapist and had accompanied her during dental surgery. Because the foster mother had concerns that A.M. was acting out sexually, the foster mother had recorded A.M.'s behaviors, notified the Department of A.M.'s claims of sexual abuse, and ensured that A.M. attended behavioral therapy. The foster family also transported the children to the Department for visitation with Mother.

On appeal, Father asserts that during the first two years of A.M.'s life, he and Mother provided a relatively happy and safe home for her and asserts that he was an active parent. He contends that he desires to maintain a relationship with his children and that, despite his incarceration, he had attempted to build a relationship by sending a letter and a drawing to his children.

A.M. was two years old when Father went to prison and was almost four years old at the time of trial. Father had been incarcerated twenty months and admits on appeal that he has no relationship with H.M. On a couple of occasions, A.M. had asked her foster mother where Father was and why she could not see him, but the foster mother testified that A.M. had never cried for her father. Five other witnesses reported that A.M. never asked about Father in their presence. Based on all of this evidence, the fact finder could have determined that this factor weighs in favor of the best-interest finding.

*iv.     Programs available to Father*

The fifth factor examines the programs available to assist the individuals seeking custody to promote the children's best interests. Father admits on appeal that the evidence supported the termination of the relationship under subsection O, which required his compliance with the provisions of the court's order specifically establishing as set forth in his service plan the actions necessary for him to obtain the return of his children. Tex. Fam. Code Ann. § 161.001(b)(1)(O). At trial, Father asserted that he had completed all services available to him while incarcerated. Brown had attempted unsuccessfully to verify with prison personnel that Father had satisfied this requirement of his service plan. No evidence was presented to show programs available to Father on his release. This factor is neutral.

*v.     Plans for the children and stability of the home or proposed placement*

The sixth factor examines the plans for the child by the individuals or the agency seeking custody. The seventh factor examines the stability of the home or proposed placement. We consider these factors together. The fact finder may compare the parent's and the Department's plans for the children and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *J.D.*, 436 S.W.3d at 119–120.

At trial, Father did not identify his plans for the children but did address his desire to reestablish his relationship with Mother. Father was uncertain of his future with Mother but favored a relationship with her as long as they were "both strong

enough in [their] sobriety." He expressed a willingness to commit to his family that he would stay away from drugs, to move away to "start a new life," and to remove his family from their old friends. Father did not believe that Mother's parental rights should be terminated and felt that she deserved to be with their children. While Father testified that he would seek custody of his other children on release from prison, he did not express any plans for A.M. and H.M.

Father acknowledges that the Department proved at trial that he had been convicted of the offenses of knowingly concealing stolen property, possession of a stolen vehicle, and theft of property. However, he contends that the Department failed to prove that he had been or would be confined from September 19, 2017, the date on which the Department filed its petition, to September 19, 2019.[7] He notes that the evidence showed that he had been paroled from Oklahoma after discharging his sentences there and that he was expected to be paroled in Texas in May 2019. He therefore argues that no reasonable fact finder would have formed a firm belief or conviction that he knowingly engaged in criminal conduct resulting in his conviction and confinement or imprisonment and inability to care for his children for not less than two years from the date of the filing of the petition pursuant to ground Q.

---

[7]Father claims on appeal that his parole was approved on April 24, 2019, and that he is projected to be released from confinement on September 9, 2019. We may not consider evidence that was not before the trial court. *See In re S.D.*, No. 05-18-00809-CV, 2018 WL 6427646, at *4 (Tex. App.—Dallas Dec. 7, 2018, pet. denied) (mem. op.) (recognizing that appellate court could not consider document that was not in evidence).

Father argues that our evaluation of whether the termination of his relationship was in the best interest of the children should disregard the argument that his confinement "creates [an] inability" to care for his children.

Brown testified that Father had not expressed to him any plan for the children if they were placed with him. The Department's plan for the children was to terminate the parent-child relationship and for the foster parents to adopt. The foster parents' plan was to adopt the children if Mother and Father's parent–child relationships are terminated.

There is evidence that A.M. has little or no attachment to Father. There is no evidence that H.M. has any attachment to Father. However, there is evidence that the children are well-bonded with the foster parents and their children.

The foster parents' nanny testified that she had observed a good relationship between the foster parents and the children and stated that the children are attached to the foster parents. A.M. and H.M. have a very good, loving relationship with each other. At the time of trial, H.M. was not walking or talking yet and had difficulty crawling, but she had progressed since being with the foster family. A.M. called foster mother, "Mommy," and foster father, "Daddy."

Several witnesses testified regarding the stability of the home or proposed placement. Father agreed that being in prison was not good for his children and that a parent who is in and out of prison cannot provide a stable life for his children. LeBlanc testified that stability is important for a child and that both the movement of

a parent in and out of jail and of children from home to a foster home contributes to instability.

Jennifer Ware was the conservatorship supervisor for the Department and is Brown's supervisor. Based on her review of the case, Ware believed it was proper to terminate the parents' rights. Ware expressed concern that if Father was convicted of another criminal felony offense, his punishment could be enhanced to confinement for up to ninety-nine years or life, which she noted was possible based on Father's prior criminal conduct. Ware believed the threat of such a long confinement would present problems for the children. Ware was also concerned about the future of the children if their parents' rights were not terminated because children who remain in foster care are essentially "stuck in a system of not having a forever home, [and] stuck in a system . . . where they don't always have that guarantee of their parents to fall back on, because legally there's not a parent . . . which is not a good environment for the child."

Court-appointed special advocate Rhonda Smithson served as the children's guardian ad litem and reports directly to the court. Smithson had visited the children in their foster home or other locations on fifteen or sixteen occasions. Smithson had originally hoped that the children would be able to go home but believed the foster family had provided the children a safe and stable home and had met their emotional, physical, and mental needs. She had discussed with the foster family the possibility of adopting the children. Because of Mother and Father's drug use, Father's

incarceration for possibly up to two more years, and Father's inability to provide a home for the girls at the conclusion of trial, Smithson did not believe that Mother or Father could meet the children's needs or parent properly, particularly regarding A.M.'s special needs. Smithson recommended that Father's relationship with the children be terminated because she thought termination would be in their best interest.

From this evidence, the fact finder could have determined that the Department's plan for the children was realistic and that the proposed placement would provide the children with a stable home. Each of these factors supports the best-interest finding.

### vi. Parent's acts or omissions

The eighth factor examines the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one. By his acts, Father committed and was convicted of multiple criminal offenses which resulted in his repeated incarceration and absence from his children, and he had a long history of drug use as well as a drug conviction. Father admitted that while at home he had used methamphetamine, which leaves a residue that endangers children even if children are not present when the drug is being smoked. As Brown acknowledged, Father had allowed his children to remain in the home where he and Mother had used methamphetamine. By omission, Father failed to complete his service plan and made few attempts to continue or develop a relationship with the children through

correspondence. Based on this evidence, the fact finder could have found that the existing parent–child relationship between Father and the children is not a proper one. This factor supports the best-interest finding.

### vii.    Excuse for the parent's acts or omissions

Finally, the ninth factor is whether there is any excuse for the parent's acts or omissions. Father notes that he was provided only a single in-person interaction with "the Department" one month prior to trial, that all other interaction occurred by written correspondence, and that he was not present at any hearings before trial. Because of the children's ages, his limited contact with the Department, his isolation, and his lack of necessary information regarding the importance of ongoing communication with the children, Father asserts that it is reasonable to assume that the exercise of writing letters to his illiterate children was a nonproductive exercise. He also argues that he was never admonished regarding the potential loss or restriction of his parental rights for noncompliance with the service plan and that he understood only Mother's rights would be terminated while he would be named a possessory conservator with limited and supervised visitation. Father's and Brown's testimony regarding the matters discussed during their meeting weeks before trial is in conflict. Because there is conflicting evidence, this factor is neutral.

### c.    Conservatorship argument

Without citation to authority, Father argues that the Department failed to produce any evidence that the children's emotional and physical interest would be

41

sacrificed if Father was appointed possessory conservator with supervised visitation. Father has not directed us to any authority requiring that the Department produce such evidence, and we have found none. *Cf. In re S.C.*, 02-18-00422-CV, 2019 WL 2455612, at *14 (Tex. App.—Fort Worth June 13, 2019, no pet. h.) (holding that parent in termination case has no right to a conservatorship question in court's charge).

### d.     *Factors Weigh in Favor of Best-Interest Finding*

Father asserts that evidence supporting the predicate termination grounds set forth in subsections D, E, N, and Q do not support a finding that termination is in the best interest of the children. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (Q). In support of these assertions, Father also contends that when viewing the entirety of the record, the findings based on subsections D, E, and Q are unsupported by evidence and do not permit a fact finder to reasonably form a firm belief or conviction that he violated those grounds. *Id.*

After considering the evidence related to the *Holley* factors and Father's arguments regarding the weight to be given the evidence supporting the predicate termination grounds in performing our analysis of whether termination was in the children's best interest, we conclude under both the legal and factual sufficiency standards of review that the fact finder could have reached a firm conviction or belief that termination of Father's parental rights is in the best interest of the children. We overrule Father's sole issue.

## IV. CONCLUSION

Finding no arguable grounds for Mother's appeal and having overruled Father's sole issue, the order terminating Mother's and Father's parental relationships with the children is affirmed.

/s/ Dana Womack

Dana Womack
Justice

Delivered: July 25, 2019